NATIONAL LABOR RELATIONS BOARD *v.* ACME
INDUSTRIAL CO.

No. 52.   Argued November 14, 1966.—Decided January 9, 1967.

*Norton J. Come* argued the cause for petitioner. With him on the brief were *Solicitor General Marshall, Arnold Ordman, Dominick L. Manoli* and *Nancy M. Sherman.*

*E. Allan Kovar* argued the cause and filed a brief for respondent.

*Joseph L. Rauh, Jr., John Silard, Stephen I. Schlossberg* and *Harriett R. Taylor* filed a brief for Amalgamated Local Union No. 310, UAW, AFL–CIO, intervenor.

MR. JUSTICE STEWART delivered the opinion of the Court.

In *NLRB* v. *C & C Plywood Corp., ante,* p. 421, decided today, we dealt with one aspect of an employer's duty to bargain during the term of a collective bargaining agreement. In this case we deal with another—involving the obligation to furnish information that allows a union to decide whether to process a grievance.

In April 1963, at the conclusion of a strike, the respondent entered into a collective bargaining agreement with the union which was the certified representative of its employees. The agreement contained two sections relevant to this case. Article I, § 3, provided, "It is the Company's general policy not to subcontract work which is normally performed by employees in the bargaining unit where this will cause the layoff of employees or prevent the recall of employees who would normally perform this work . . . ." In Art. VI, § 10, the respondent agreed that "[i]n the event the equipment of the

plant . . . is hereafter moved to another location of the Company, employees working in the plant . . . who are subject to reduction in classification or layoff as a result thereof may transfer to the new location with full rights and seniority, unless there is then in existence at the new location a collective bargaining agreement covering . . . employees at such location." A grievance procedure culminating in compulsory and binding arbitration was also incorporated into the collective agreement.

The present controversy began in January 1964, when the union discovered that certain machinery was being removed from the respondent's plant. When asked by union representatives about this movement, the respondent's foremen replied that there had been no violation of the collective agreement and that the company, therefore, was not obliged to answer any questions regarding the machinery. After this rebuff, the union filed 11 grievances charging the respondent with violations of the above quoted clauses of the collective agreement. The president of the union then wrote a letter to the respondent, requesting "the following information at the earliest possible date:

"1. The approximate dates when each piece of equipment was moved out of the plant.

"2. The place to which each piece of equipment was moved and whether such place is a facility which is operated or controlled by the Company.

"3. The number of machines or equipment that was moved out of the plant.

"4. What was the reason or purpose of moving the equipment out of the plant.

"5. Is this equipment used for production elsewhere."

The company replied by letter that it had no duty to furnish this information since no layoffs or reductions in

job classification had occurred within five days (the time limitation set by the contract for filing grievances) prior to the union's formal request for information.

This refusal prompted the union to file unfair labor practice charges with the National Labor Relations Board. A complaint was issued, and the Board, overruling its trial examiner, held the respondent had violated § 8 (a)(5) of the Act[1] by refusing to bargain in good faith. Accordingly, it issued a cease-and-desist order. The Board found that the information requested was "necessary in order to enable the Union to evaluate intelligently the grievances filed" and pointed out that the agreement contained no "clause by which the Union waives its statutory right to such information."

The Court of Appeals for the Seventh Circuit refused to enforce the Board's order. 351 F. 2d 258. It did not question the relevance of the information nor the finding that the union had not expressly waived its right to the information. The court ruled, however, that the existence of a provision for binding arbitration of differences concerning the meaning and application of the agreement foreclosed the Board from exercising its statutory power. The court cited *United Steelworkers* v. *Warrior & Gulf Co.,* 363 U. S. 574, and *United Steelworkers* v. *American Mfg. Co.,* 363 U. S. 564, as articulating a national labor policy favoring arbitration and requiring the Board's deference to an arbitrator when construction and application of a labor agreement are in issue. We granted certiorari to consider the substantial question of federal labor law thus presented. 383 U. S. 905.

There can be no question of the general obligation of an employer to provide information that is needed by

---

[1] National Labor Relations Act, as amended, 61 Stat. 141, 29 U. S. C. § 158 (a)(5).

the bargaining representative for the proper performance of its duties. *Labor Board* v. *Truitt Mfg. Co.*, 351 U. S. 149. Similarly, the duty to bargain unquestionably extends beyond the period of contract negotiations and applies to labor-management relations during the term of an agreement. *NLRB* v. *C & C Plywood Corp.*, *ante*, p. 421; *Labor Board* v. *F. W. Woolworth Co.*, 352 U. S. 938. The only real issue in this case, therefore, is whether the Board must await an arbitrator's determination of the relevancy of the requested information before it can enforce the union's statutory rights under § 8 (a)(5).

The two cases upon which the court below relied, and the third of the *Steelworkers* trilogy, *United Steelworkers* v. *Enterprise Wheel & Car Corp.*, 363 U. S. 593, do not throw much light on the problem. For those cases dealt with the relationship of courts to arbitrators when an arbitration award is under review or when the employer's agreement to arbitrate is in question. The weighing of the arbitrator's greater institutional competency, which was so vital to those decisions, must be evaluated in that context. 363 U. S., at 567, 581–582, 596–597. The relationship of the Board to the arbitration process is of a quite different order. See *Carey* v. *Westinghouse Corp.*, 375 U. S. 261, 269–272. Moreover, in assessing the Board's power to deal with unfair labor practices, provisions of the Labor Act which do not apply to the power of the courts under § 301,[2] must be considered. Section 8 (a)(5) proscribes failure to bargain collectively in only the most general terms, but § 8 (d) amplifies it by defining "to bargain collectively" as including "the mutual obligation of the employer and the representative of the employees to meet at reasonable times and confer in good faith with respect to . . . any question arising

---

[2] Labor Management Relations Act, 1947, 61 Stat. 156, 29 U. S. C. § 185.

[under an agreement] . . . ." [3]   And § 10 (a)[4] provides: "The Board is empowered . . . to prevent any person from engaging in any unfair labor practice . . . .   This power shall not be affected by any other means of adjustment or prevention that has been or may be established by agreement, law, or otherwise . . . ."   Thus, to view the *Steelworkers* decisions as automatically requiring the Board in this case to defer to the primary determination of an arbitrator [5] is to overlook important distinctions between those cases and this one.

But even if the policy of the *Steelworkers Cases* were thought to apply with the same vigor to the Board as to the courts, that policy would not require the Board to abstain here.   For when it ordered the employer to furnish the requested information to the union, the Board was not making a binding construction of the labor contract.   It was only acting upon the probability that the desired information was relevant, and that it would be of use to the union in carrying out its statutory duties and responsibilities.   This discovery-type standard decided nothing about the merits of the union's contractual claims.[6]   When the respondent furnishes the requested

---

[3] Cf. *United Steelworkers* v. *Warrior & Gulf Co.*, 363 U. S. 574, 581: "The grievance procedure is, in other words, a part of the continuous collective bargaining process."

[4] 61 Stat. 146, 29 U. S. C. § 160 (a).

[5] See *Sinclair Refining Co.* v. *N. L. R. B.*, 306 F. 2d 569, 570 (C. A. 5th Cir.).

[6] Cf. 4 Moore, Federal Practice ¶ 26.16[1], 1175–1176 (2d ed.):
"[I]t must be borne in mind that the standard for determining relevancy at a discovery examination is not as well defined as at the trial. . . . Since the matters in dispute between the parties are not as well determined at discovery examinations as at the trial, courts of necessity must follow a more liberal standard as to relevancy."
*Id.*, at 1181:
"Examination as to relevant matters should be allowed whether or not the theory of the complaint is sound or the facts, if proved, would support the relief sought."

438

information, it may appear that no subcontracting or work transfer has occurred, and, accordingly, that the grievances filed are without merit. On the other hand, even if it appears that such activities have taken place, an arbitrator might uphold the respondent's contention that no breach of the agreement occurred because no employees were laid off or reduced in grade within five days prior to the filing of any grievance. Such conclusions would clearly not be precluded by the Board's threshold determination concerning the potential relevance of the requested information. Thus, the assertion of jurisdiction by the Board in this case in no way threatens the power which the parties have given the arbitrator to make binding interpretations of the labor agreement.[7]

Far from intruding upon the preserve of the arbitrator, the Board's action was in aid of the arbitral process. Arbitration can function properly only if the grievance procedures leading to it can sift out unmeritorious claims. For if all claims originally initiated as grievances had to be processed through to arbitration, the system would be woefully overburdened. Yet, that is precisely what the respondent's restrictive view would require. It would force the union to take a grievance all the way through to arbitration without providing the opportunity to evaluate the merits of the claim.[8] The expense of arbitration might be placed upon the union only for it to learn

---

[7] This case, therefore, differs from *NLRB* v. *C & C Plywood Corp.,* ante, p. 421, where the Board's determination that the employer did not have a contractual right to institute a premium pay plan was a determination on the merits. See *C & C Plywood, ante,* at 426, and n. 10.

[8] See *Fafnir Bearing Co.* v. *N. L. R. B.,* 362 F. 2d 716, 721:

"By preventing the Union from conducting these studies [for an intelligent appraisal of its right to grieve], the Company was, in essence, requiring it to play a game of blind man's bluff."

that the machines had been relegated to the junk heap. Nothing in federal labor law requires such a result.

We hold that the Board's order in this case was consistent both with the express terms of the Labor Act and with the national labor policy favoring arbitration which our decisions have discerned as underlying that law. Accordingly, we reverse the judgment and remand the case to the Court of Appeals with directions to enforce the Board's order.

*Reversed and remanded.*