924 F.2d 518
 136 L.R.R.M. (BNA) 2374, 117 Lab.Cas. P 10,502,
14 O.S.H. Cas.(BNA) 2000
 NATIONAL LABOR RELATIONS BOARD, Petitioner,
Glass, Molders, Pottery, Plastics & Allied Workers
International, Intervenor,
v.
AMERICAN NATIONAL CAN COMPANY, FOSTER-FORBES GLASS DIVISION,
Respondent.
 No. 90-1005.
 United States Court of Appeals,
Fourth Circuit.
 Argued Oct. 30, 1990.
Decided Jan. 25, 1991.
 
 Richard A. Cohen, argued (Jerry M. Hunter, General Counsel, Robert E. Allen, Associate General Counsel, Aileen A. Armstrong, Deputy Associate General Counsel, Howard E. Perlstein, Supervising Atty., of counsel), N.L.R.B., Washington, D.C., for petitioner.
 Carl Steffen Yaller, Media, Pa., for intervenor.
 Thomas A. Farr, argued (Robert A. Valois, of counsel), Maupin, Taylor, Ellis & Adams, P.A., Raleigh, N.C., for respondent.
 Before ERVIN, Chief Judge, WIDENER, Circuit Judge, and HADEN, Chief District Judge for the Southern District of West Virginia, sitting by designation.
 ERVIN, Chief Judge:
 
 
 1
 The National Labor Relations Board petitions for enforcement of its order commanding American National Can Company, Foster Forbes Glass Division (the Company) to grant representatives of the Glass, Pottery, Plastics and Allied Workers' Union, AFL-CIO (Local 193 and International, collectively the Unions) access to the Company's Wilson, North Carolina, plant to take heat measurements necessary for processing a heat relief grievance and for monitoring the Company's compliance with the on-job health protection provisions of the parties' collective bargaining agreement. Reviewing the Board's order under Section 10(e) of the National Labor Relations Act (the Act), as amended, 29 U.S.C. Sec. 160(e), we conclude that there was substantial evidence to support the Board's finding that the Company committed an unfair labor practice. We also affirm the Board's refusal to defer the issue of union access to obtain heat information for resolution under the arbitration provision of the parties' collective bargaining agreement. Accordingly, we affirm the Board's findings and enforce the order against the Company.
 
 
 2
 * The Company operates eight glass-container manufacturing plants, including a plant in Wilson, North Carolina. The Unions represent employees from two different bargaining units at the Wilson plant--a "hot end" unit consisting of employees in the forming department and a "cold end" unit consisting of employees in the production and maintenance departments. The relief sought by the complaint relates to the Unions' role as collective bargaining agent for cold end employees, who, despite the terminology, are often subjected to extreme heat. Each of these units is covered by a separate master contract between the International and its various local affiliates and the Company, covering comparable units in each of the other seven plants.
 
 
 3
 The Company acquired the Wilson plant in 1983 from Kerr Glass Company (Kerr). The Company succeeded to Kerr's bargaining relationship with the Unions and assumed its union contracts, due to expire in March 1986. The Kerr contracts provided additional relief time for hot end employees when heat conditions warranted, but not for cold end employees. These contracts also recognized the right of international and local union representatives to enter the plant to investigate complaints and grievances concerning the interpretation or application of contract terms.[1]
 
 
 4
 In 1987 the parties agreed to extend the Company's master contracts to the Wilson plant, including the extension of the additional heat-relief provision to cover cold end employees. That provision, Article 18, Section 1(e) of the 1987 collective bargaining agreement, states that "[a]dditional relief shall be provided where heat or cold conditions warrant." At the Unions' initiative, the access provision in the Company's master contracts was renegotiated to afford access for grievance purposes to local union officials as well as to international representatives. Other pertinent provisions of the master contracts include an on-job health and safety provision and a four-step grievance provision culminating in binding arbitration.
 
 
 5
 On May 20, 1987, Local 193's president Sternfeld and other local union officials met with various plant managers to discuss their concern about heat conditions in the cold end and to clarify circumstances in which employees were entitled to heat relief under the contract. Sternfeld discussed Local 193's interest in taking atmospheric measurements in the plant with a wet bulb globe thermometer or WBGT, a small instrument that measures atmospheric conditions such as ambient temperature, radiant heat, humidity, and wind velocity. Upon Sternfeld's inquiry, the Company's plant manager, Ghegan, responded that the Company neither took heat measurements at the plant nor kept records of those measurements. Ghegan stated that there were no established guidelines under the contract and that the Company reserved the responsibility to determine when conditions warranting additional heat relief were present. Ghegan advised Sternfeld that the Company would not allow Local 193 access to take WBGT readings.
 
 
 6
 Sternfeld formalized the Unions' request for access in a letter to Ghegan dated May 23, 1987. The letter expressed Local 193's view that it was entitled to such access under the contract and the Act, and requested that the Company advise Local 193 concerning the methods the Company intended to use to determine when heat relief was warranted. Ghegan again denied Local 193's request, on the ground that the Unions had given the Company the right to decide when heat relief should be granted under Article 18, Section 1(e).
 
 
 7
 On July 2, 1987, Sternfeld and a representative of the International, Pitts, met with Ghegan and the Company's director of industrial relations, Clayton; again the Unions requested that they be granted access to take measurements with a WBGT or similar instrument, and again the request was denied. Pitts proposed that the measurements be taken by an independent safety expert or by the International's safety specialist. The Company officials refused to consider either of these options, reiterating that the Company would have to make the determination as to what was meant by the contract term "conditions warranted."
 
 
 8
 On September 25, 1987, Local 193 filed a grievance alleging that the Company was in violation of Article 18, Section 1(e) by not providing employees heat relief in accordance with the contract. The Company denied the grievance at stages two and three of the grievance procedure, asserting that it had complied with the contract. Local 193 did not pursue the grievance further.
 
 
 9
 The Unions filed an unfair labor practice charge with the Board on November 18, 1987, alleging that the Company had refused to bargain in good faith as required by Sections 8(a)(1) and 8(a)(5) of the Act, 29 U.S.C. Sec. 158(a)(1), (a)(5), by refusing to provide relevant requested information pursuant to the collective bargaining procedure. After the Unions had filed this charge, the Company offered to arbitrate the question of the Unions' right of access to the plant together with its heat-relief grievance. A hearing was held before an Administrative Law Judge (ALJ) on March 15, 1988. On May 29, 1988, the ALJ issued a recommended order that the issues raised by the complaint be deferred for resolution under the arbitration provisions of the parties' collective bargaining agreement.
 
 
 10
 The General Counsel and the Unions filed exceptions to the ALJ's decision. After briefing, the Board entered a decision and order on April 28, 1989, in which the Board reversed the ALJ's decision to defer the case to arbitration and ruled that the Company had violated Sections 8(a)(1) and 8(a)(5) of the Act. The Board ordered the Company to grant the Unions access to the Wilson plant "for reasonable periods of time at reasonable times," to take heat measurements necessary for processing Local 193's heat grievance and for monitoring the Company's compliance with the health protection provisions of the parties' collective bargaining agreement. In March 1990 the Board applied to this Court for enforcement of its order.
 
 II
 
 11
 The first issue before us is whether the Board abused its discretion by refusing to defer the issues relating to the taking of heat measurements for resolution under the arbitration provisions of the parties' collective bargaining agreement. The Board's decision concerning deferral to arbitration is to be affirmed unless found to be an abuse of discretion. Roadway Express, Inc. v. NLRB, 647 F.2d 415, 418-19 (4th Cir.1981).
 
 
 12
 The Company contends that the matters of access and heat relief are subjects governed by the collective bargaining agreement, and that by issuing an order on these matters instead of deferring them to arbitration the Board has improperly established a binding construction of a provision in the collective bargaining agreement. The Company charges the Unions with trying to renegotiate the agreement and force the Company to comply with certain measurement criteria which were not negotiated over.[2]
 
 
 13
 The Unions' complaint before the ALJ charged the Company with failing to provide the Unions access to the plant to gather information related to health and safety conditions. Focussing on the issue of access, the ALJ found deferral appropriate primarily on the basis that the statutory right to access claimed by the Unions is paralleled by the parties' collective bargaining agreement and thus is not dependent on the Act. The ALJ concluded that in such a case the existence of the contractual provision is controlling on the issue of deferral, which promotes a stated goal of the Act by encouraging the practice of voluntary collective bargaining. 29 U.S.C. Sec. 151; Carey v. Westinghouse Electric Corp., 375 U.S. 261, 271, 84 S.Ct. 401, 408, 11 L.Ed.2d 320 (1964), quoted in Collyer Insulated Wire, 192 N.L.R.B. 837, 840 (1971). The interpretation and extent of application of the access provision are matters within the province and expertise of arbitrators and not the Board. See Collyer, supra, 192 N.L.R.B. at 841-42 (Board should defer to arbitration when it appears that arbitral interpretation of the contract will resolve both the unfair labor practice issue and the contract interpretation issue); Transport Service Co., 282 N.L.R.B. 111 (1986) (Board deferred to arbitration where collective bargaining agreement's grievance and arbitration provisions were sufficiently broad to encompass the issue of access and Company stated willingness to arbitrate).
 
 
 14
 The Board noted, however, that in Transport Service, even while deferring certain unfair labor practice issues to arbitration, the Board ordered the Company to comply with the Union's request to make available "all relevant information necessary to process the matters through the grievance and arbitration procedures." 282 N.L.R.B. at 111, n. 3, and 119-20. Although the Board's guidelines have been less than clear as to when deferral is or is not appropriate in cases in which no arbitral award has yet issued, Collyer, supra, 192 N.L.R.B. at 841, the Board has traditionally refused to defer in right-to-information cases. This policy is based on the recognition that the Union's right to information that is relevant to the Union's performance of its responsibilities is statutory and not contractual, especially when it concerns health and safety conditions. See General Electric Co. v. NLRB, 414 F.2d 918, 924 (4th Cir.1969), cert. denied, 396 U.S. 1005, 90 S.Ct. 557, 24 L.Ed.2d 496 (1970), quoting Timken Roller Bearing Co. v. NLRB, 325 F.2d 746, 751 (6th Cir.1963), cert. denied, 376 U.S. 971, 84 S.Ct. 1135, 12 L.Ed.2d 85 (1964).
 
 
 15
 The Board found that the Unions' allegation did not primarily concern the issue of access--the Unions' concern was the obtaining of needed information which the Company had repeatedly refused to supply. The Unions raised the issue of access only because the Company's refusal to cooperate made access necessary in order to obtain the information. The Board held that the principles traditionally applied in refusing to defer request-for-information cases are equally applicable to the question whether to defer request-for-access-to-obtain-information cases. Moreover, the Board expressed concern that deferral in such cases can lead to a two-tiered dispute resolution procedure, whereby the Union would have to file one grievance to obtain the needed information, followed by a second grievance concerning the access provision. In the Board's view, such a procedure constitutes an "unacceptable impediment to the right of the Respondent's employees to be effectively represented by their collective bargaining representatives." American National Can Co., 293 N.L.R.B. 110 at 9 (1989).
 
 
 16
 We agree with the Board's analysis. The Company has a duty to supply information that is relevant and reasonably necessary to the performance of the Unions' responsibilities. NLRB v. Acme Industrial Co., 385 U.S. 432, 435-46, 87 S.Ct. 565, 567-68, 17 L.Ed.2d 495 (1967). Yet the Company repeatedly refused to comply in any way with the Unions' request for information--not only the request for Union access to obtain such information, but also the Unions' requests for the Company to supply information as to what measurements and criteria it was using to deal with the heat relief problem. Until the Unions filed the unfair labor practice charge with the Board, the Company was clearly not willing to negotiate its interpretation of the heat relief provision with the Unions, in spite of the fact that the duty to bargain extends beyond the period of contract negotiations to the arena of labor-management relations during the term of an agreement.[3] Acme, supra, at 436, 438, 87 S.Ct. at 568, 569, citing NLRB v. C. & C. Plywood Corp., 385 U.S. 421, 87 S.Ct. 559, 17 L.Ed.2d 486 (1967).
 
 
 17
 We find meritless the Company's contention that the Unions are attempting to bind the Company to an interpretation of the access provision which mandates the use of the NIOSH Criteria as the standard for measuring Company compliance. At no stage in the proceedings have the Unions made the use of the NIOSH Criteria an issue, and they have acknowledged that these Criteria do not represent the only heat-stress standards that can be used with WBGT readings. See National Institute for Occupational Safety and Health, Occupational Exposure to Hot Environments, Revised Criteria, 88-100 (1986). Moreover, the ALJ correctly pointed out that the Company would not be bound to the NIOSH Criteria by the fact that the Unions are permitted to take WBGT readings. If the Unions were to actually use the Criteria to determine that the Company was not complying with its duty under the heat-relief provision, the Company would then have the opportunity to press its own statutory interpretation claim, supported by its evidence of compliance according to whatever standard it has chosen to use. This situation is appropriately governed by Acme, supra, in that an arbitrator's eventual finding in favor of the Company is not precluded by the Board's threshold determination of the relevance of the requested information. 385 U.S. at 438, 87 S.Ct. at 569 (observing that refusal to defer a request-for-information case actually aids the functioning of the arbitration process by allowing evaluation of the merits of the claim before placing expenses of arbitration on the union).
 
 III
 
 18
 As a reviewing court, we must affirm the Board's findings of fact if they are supported by substantial evidence on the record considered as a whole. Florida Steel Corp. v. NLRB, 601 F.2d 125, 129 (4th Cir.1979). We find that substantial evidence supports the Board's finding that the Company committed an unfair labor practice in refusing to allow the Unions access to obtain information relevant to heat relief.
 
 
 19
 The Unions were not required to present particularized evidence concerning the relevance of the information they wanted. Information sought by a union concerning health and safety conditions is presumptively relevant because these are mandatory bargaining subjects. NLRB v. Holyoke Water Power Co., 778 F.2d 49, 51 (1st Cir.1985), cert. denied, 477 U.S. 905, 106 S.Ct. 3274, 91 L.Ed.2d 565 (1986). A broad discovery-type standard applies to requests for the production of such information; it is only necessary that the requested information be of apparent aid in the investigation of an alleged contract violation. Florida Steel Corp. v. NLRB, 601 F.2d 125, 129 (4th Cir.1979); NLRB v. Associated General Contractors, 633 F.2d 766, 772 (9th Cir.1980), cert. denied, 452 U.S. 915, 101 S.Ct. 3049, 69 L.Ed.2d 418 (1981). Only when faced with an "effective employer rebuttal" must the union show the precise relevance of the requested information. NLRB v. A.S. Abell Co., 624 F.2d 506, 510 (4th Cir.1980). All the Company offered in rebuttal was its evidence on the parties' past interpretation and application of the collective bargaining agreement. This evidence is insufficient to forestall disclosure of presumptively relevant information concerning the health and safety of the Company's employees.
 
 
 20
 Having found that the Unions were entitled to obtain the heat-measurement information, the Board further determined, applying the analysis set forth in Holyoke Water Power Co., 273 N.L.R.B. 1369, enf'd, 778 F.2d 49 (1st Cir.1985), that the Unions were entitled to access to the Wilson plant to obtain this information.
 
 
 21
 Holyoke held that a union is not automatically entitled to access to an employer's premises to obtain information simply because the information has been shown to be relevant to the union's proper performance of its representational duties. The right of employees to be responsibly represented by a labor union must be balanced against the right of the employer to control its property and ensure that its operations are not interfered with. Holyoke thus requires that in a given case the Board determine whether responsible representation of employees can be achieved by any means other than entry onto the employer's premises. If the Board finds that alternative means exist, the union may properly be denied access. On the other hand, when it is found that responsible representation requires union access to the employer's premises, the employer's property rights must yield to the extent necessary to achieve this end without unwarranted interruption of the employer's operations. Holyoke, supra, 273 N.L.R.B. at 1370.
 
 
 22
 The Board found nothing in the record to indicate that the Unions could obtain in-plant heat data without their representatives' actual entry into the plant. In fact, the Board concluded that the Company itself had rendered union access necessary by its refusal to provide the Unions requested heat-related information, to reveal what measures the Company was taking to monitor heat conditions, and to grant the Unions' conciliatory request to permit a third party access to take heat measurements.
 
 
 23
 Weighing the Company's interest in maintaining its operations unimpeded, the Board found the record likewise bare of evidence sufficient to show that granting the Unions access to take WBGT measurements for reasonable periods at reasonable times would necessarily undermine the Company's control of the plant or significantly interfere with the plant's operations. Thus, under Holyoke, the Company was required to grant the Unions access to take the necessary readings.
 
 
 24
 The Board's ultimate determinations concerning relevancy and the balance to be struck between competing interests are entitled to considerable deference because they fall "in an area of substantial Board expertise." Florida Steel, supra, 601 F.2d at 129; accord Hudgens v. NLRB, 424 U.S. 507, 522, 96 S.Ct. 1029, 1037, 47 L.Ed.2d 196 (1976). We find no grounds for disturbing the Board's determination of the Unions' right to access. The Company's claim that extensive and disruptive testing of employees for metabolic heat information would be necessary in order to render atmospheric WBGT readings effective does not comport with information contained in the NIOSH Criteria. The metabolic heat values can be estimated, using tables of energy expenditure and task analysis provided by NIOSH. See National Institute for Occupational Safety and Health, Occupational Exposure to Hot Environments, Revised Criteria, 58-61 (1986). Hourly readings are needed only during periods of maximum heat. Id. at 3. The Company failed to present sufficient evidence of potential disruption to deny the Unions access when the Board has determined that the Unions have no other means of responsibly representing the employees in this matter.
 
 
 25
 We have considered the other positions advanced by the Company and find them to be without merit. We hold that, on the record as a whole, the findings of the Board are supported by substantial evidence, and that the Board is therefore entitled to enforcement of its order.
 
 
 26
 ENFORCEMENT GRANTED.
 
 
 
 [1]
 At the time the Company assumed the Kerr contracts, the Company's master contracts for its other seven plants provided heat relief for both hot end and cold end employees, but did not provide for a right of access on behalf of local union officials
 
 
 [2]
 The Company refers to the Criteria for a Recommended Standard for Occupational Exposure to Hot Environments (1986), issued by the Department of Health and Human Services' National Institute for Occupational Safety and Health (NIOSH Criteria)
 
 
 [3]
 The Company's interpretation was that the determination of when conditions warrant additional heat relief is the exclusive prerogative of the Company. The Company claimed this interpretation had always been understood by all parties, but there is no evidence in the record to indicate that the Unions had so understood the provision. The fact that the Unions accepted the language that was in the Foster Forbes contracts on heat relief does not prove that they knew what the Company's interpretation of the provision had been or would be. As far as the Wilson plant was concerned, the Unions were accustomed to the practices of Kerr Glass, not those of Foster Forbes